OPINION
{¶ 1} Appellant Michelle Lennon appeals the decision of the Stark County Court of Common Pleas, Juvenile Division, which adjudicated against a finding of abuse in a dependency/neglect/abuse complaint filed by the Stark County Department of Job and Family Services ("SCDJFS")[1]. Appellee Charles Lennon is appellant's former spouse. The relevant facts leading to this appeal are as follows.
 {¶ 2} Appellant and appellee were married from approximately 1997 to 2000. They are the parents of Kirsten Lennon (hereinafter "the child"), born in 1998. On July 18, 2002, SCDJFS filed a complaint alleging that the child was dependent, neglected, and/or abused, indicating that SCDJFS had first become involved in April 2002, based on concerns that the child was the victim of sexual abuse and identifying her father, appellee, as the perpetrator. An initial hearing was conducted on July 19, 2002. Appellant at that time stipulated to the issuance of an emergency shelter care order. The court ordered the child to remain in the custody of appellant, and issued a no contact order between appellee and the child.
 {¶ 3} An evidentiary hearing was conducted on the SCDJFS complaint on October 15, 2002, as further analyzed infra. The trial court found that the child was dependent as defined under R.C. 2151.04, but concluded that SCDJFS had not proven the child was abused by clear and convincing evidence. Upon disposition, the no contact order issued against appellee was vacated. The trial court also ordered the case plan to be amended to permit supervised companionship by appellee.
 {¶ 4} Appellant filed a notice of appeal on November 15, 2002, and herein raises the following sole Assignment of Error:
 {¶ 5} "I. The trial court's finding that [the child] was not abused was contrary to the manifest weight of the evidence."
 I. {¶ 6} In her sole Assignment of Error, appellant contends the court's finding of no abuse was against the manifest weight of the evidence. We disagree.
 {¶ 7} Pursuant to R.C. 2151.35(A), a trial court must find that a child is an abused, neglected, or dependent child by clear and convincing evidence. In re Kasper Children (June 30, 2000), Stark App. No. 1999CA00216, unreported. As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck v. Jeffries
(Feb. 10, 1982), Stark App. No. CA-5758, unreported. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Construction
(1978), 54 Ohio St.2d 279, 281. The relevant statute, R.C. 2151.031, includes in the definition of "abused child" any child who: "(A) Is the victim of `sexual activity' as defined under Chapter 2907. of the Revised Code, where such activity would constitute an offense under that chapter, except that the court need not find that any person has been convicted of the offense in order to find that the child is an abused child."
 {¶ 8} At the adjudication hearing sub judice, SCDJFS first called as a witness intake worker Mike Davies. His records indicated one prior agency involvement concerning this child, but the abuse and neglect concerns raised at that time were determined to be unsubstantiated. According to his testimony, SCDJFS became involved in the case sub judice as a result of domestic violence concerns, and furthermore when the child's babysitter stated she had observed the child touching herself excessively. Davies conducted interviews with the child, at some points with appellant observing. Davies testified the child told him, using anatomical drawings, that appellee had stuck his fingers in her vagina and "in her butt." Tr. at 21. Davies also related that the child disclosed that appellee touched her body with his body, and that she had touched his penis area with her hands and mouth. Davies also interviewed appellee in the presence of two law enforcement officers. Based on his investigation, Davies recommended a complaint alleging abuse.
 {¶ 9} SCDJFS next called Dr. Gerald Bello, a child psychologist. Although appellee's counsel successfully moved to exclude Bello's written report based on late discovery, Bello described his office's protocol for conducting assessments of young children, as was done in this case. The protocol involved allowing the child to play with clay and drawing materials to allow Bello's team to look for abuse indicators in the process. Bello indicated the child was reluctant to make a clay model of appellee when asked to construct family members. At a point in the assessment, the child made a vague reference to playing a "laying down game with her dad," and appeared to become anxious and pulled her legs up in a fetal position as she sat in her chair. Bello's observations were "strongly suggestive that the child was sexually violated." Tr. at 72. Bello also explained that expression of abuse via the art activity was not conducive to "coaching" by a parent. Furthermore, in the case sub judice, the child's IQ was calculated by Bello's team as "borderline high average superior."
 {¶ 10} SCDJFS then rested its case, after admitting two exhibits. Appellee briefly called a Stark County sheriff deputy who had participated in Davies' interview of appellee. Appellee then called child psychologist Dr. Robyn Tener. The situation was referred to her for a sexual abuse assessment in the spring of 2002. Tener met with the child on three occasions in April and May of 2002, for approximately fifty minutes on each visit. Tener also met individually with appellant, appellant's parents, and appellee. She recalled that appellant, following the last of the three interviews with the child, was immediately "very frantic to know what [the child] had told me * * *." Tr. at 120. Tener considered this unusual, as arrangements had already been made to provide appellant such data at a later time. However, Tener nonetheless accepted that the matter involved "a very anxious parent in a difficult situation * * *." Tr. at 120.
 {¶ 11} In assessing the potential amount of negative parental influence on the child, Tener specifically declined to utilize the phrase "coaching." Tr. at 125. However, noting that the child was more focused on appellant's opinions of appellee than vice versa, Tener opined that "[i]t doesn't necessarily rule sexual abuse out and it doesn't necessarily rule it in, but it does say that this child is subjected to some pretty powerful influences and some viewpoints that could color her understanding or her perception of certain kinds of events, including things like toileting, or bathing, how a parent plays." Tr. at 128. Also, the child indicated to Tener that she was afraid to urinate or defecate, leading Tener to subsequently inquire of appellee about his participation in the child's toilet activity. According to Tener, appellee stated that the child did have defecation problems and " * * * sometimes part of helping her was to insert a finger in to help * * * remove the feces." Tener noted that on those occasions when the child was able to supply context for her remarks, the focus was centered around toileting or feces removal. Tener recalled the "child did make other statements, she talked about even daddy puts in (sic) front of my back, but to get some kind of context, when did this happen, you know, there was no story that she could ever build around it, it was always a discreet statement versus this kind of touching happens when I'm in the bathroom, I'm having trouble going poop * * *." Tr. at 137.
 {¶ 12} Tener also assessed an incident involving a picture the child had drawn, which she reportedly described to her grandmother as a "cock." Tener asked her to identify the drawing, even reminding her that it was the picture she had made for her grandmother and suggesting that it "was something about daddy," but the child did not recognize or acknowledge the drawing. Tr. at 136. The child also told Tener, referring to appellee, "mommy says I can't see him," as well as similar statements as to taking a bath or sleeping at appellee's house. Finally, according to Tener, the child denied any vaginal touching by appellee. Tener was of the opinion that the child had experienced some type of intrusive episode, but summarized that her evaluation was inconclusive as to sexual abuse. Tr. at 138.
 {¶ 13} Appellee next called Attorney John Frank, the guardian ad litem appointed to the case in March 2002, at which time the parties were involved in a domestic relations proceeding, in which appellee was seeking to expand companionship time with the child. As matters progressed, there was a domestic violence proceeding as well, followed by the dependency/neglect/abuse action at issue. Frank stated he visited with appellant and appellee in their respective homes as part of his duties in the domestic relations case. Frank became aware of the dependency/neglect/abuse action via a telephone call from appellee, and attended the initial hearing on July 19, 2002. He prepared a report at that time referencing that there had been three supervised visits between the child and appellee on June 13, June 22, and June 29, 2002, with appellee's parents functioning as supervisors, and that the child reportedly had disclosed sexual contact as occurring during said visits. Frank testified that appellant called him on May 3, 2002, requesting an immediate appointment to review some documentation she possessed. Frank replied to her that he desired to see and familiarize himself with the documents, and would then set up an appointment. Appellant, however, did not bring said documentation to his office until May 31, 2002.
 {¶ 14} Frank further testified to meetings and conversations he conducted with appellant and her parents, Neal and Judy Beans, in which he noticed what he considered vilification against appellee. On March 1, 2002, Frank met with appellant at her home, during which appellant's conversation routinely reverted to "very negative comments" about appellee, causing Frank to end the meeting in part because the child frequently wandered into the room. Tr. at 170. Frank recalled he met with appellant again on April 2, 2002, which consisted again of almost exclusively "negative comments" about appellee, a scenario which matched a meeting he had conducted with Mr. and Mrs. Beans on March 28, 2002. Tr. at 170-171. During cross-examination, Frank conceded that he did not have formal education in the realm of sexual abuse assessment or in detecting coaching or influencing of children, but relied on experience from the cases in which he had served. Tr. at 176.
 {¶ 15} Appellee also called as witnesses Jane Lennon and Charles Lennon, Sr., appellee's mother and father. Both were questioned as to a visitation they supervised between the child and appellee in Massillon, Ohio, on June 29, 2002. Both denied that appellee had the opportunity during said visit to be alone with the child. Lennon, Sr., added that he feared being in a supervisory role, as he felt it highly likely that there might be more allegations, even though the prior accusations had been dropped. Tr. at 190.
 {¶ 16} Finally, appellee himself took the stand. He admitted to his prior domestic violence conviction in 1995, as well as a DUI conviction in 2000. Appellee also indicated he is being treated for depression. He recalled that his relationship with appellant's parents, the Beans, deteriorated during the marriage to the point that he felt they were part of the reason for the marital dissolution. Appellee recalled the child often repeating negative comments about him during his earlier visitations, which would lessen as the visit went on. He gave his version of the "toileting" incident as one in which the child soiled herself in her pants, and had to be cleaned up and bathed. He stated " * * * I just wiped the excess off, she had it all over, I had to wipe it off of her * * *." Tr. at 209. Appellee denied that the child had ever seen his penis, and denied any molestation or sexual abuse of the child.
 {¶ 17} Appellant then presented several witnesses in support of her case. Appellant first called Sarah Klinger, a director at the child's preschool. Klinger observed the child rubbing herself in her "private area" on two occasions. Tr. at 221. Based on her training and experience, Klinger felt this was a sign of sexual abuse and stated she reported same to children's services. Klinger also heard the child say "daddy makes me touch my pee-pee." Tr. at 224.
 {¶ 18} Appellant next called Laurie DeAugustino, a babysitter for the child. She testified that she had seen the child masturbating, and was informed "this is what daddy does." Tr. at 226. Appellant lastly called David Neal Beans, the child's stepgrandfather. He reported observing the child masturbate on several occasions in various locales. In one instance, he observed the child spit on two fingers, take off her underpants, and place the two fingers in her vagina. Tr. at 231.
 {¶ 19} In our assessment of the aforesaid evidence, we reiterate that in proceedings involving the custody and welfare of children, the power of the trial court to exercise discretion is peculiarly important. Thompson v. Thompson (1987), 31 Ohio App.3d 254, 258, citing Trickey v. Trickey (1952), 158 Ohio St. 9, 13. The trier of fact is in a far better position to observe the witnesses' demeanor and weigh their credibility. See State v. DeHass (1967), 10 Ohio St.2d 230. Upon full review of the evidence, we find that the record provides sufficient competent, credible evidence supporting the trial court's finding of no abuse.
 {¶ 20} Appellant's sole Assignment of Error is overruled.
 {¶ 21} For the reasons stated in the foregoing opinion, the judgment of the Court of Common Pleas, Juvenile Division, Stark County, Ohio, is hereby affirmed.
[1] SCDJFS has filed a brief as an appellee; however, it seeks reversal of the trial court's decision as to the abuse allegation.
By: Wise, J., Gwin, P. J., and Boggins, J., concur.